You may proceed, please. May it please the court, my name is Angela May and I am here to represent the appellant Rebecca Musser. This case is an appeal from the district court granting summary judgment in favor of defendants Paul Quinn College, whom I'll be referring to as PQC throughout this argument. Ms. Musser was an employee of Paul Quinn College for a little over two years. She first started out as an independent contractor in the controller role through a company called Excellence Through Insight, which was owned by Antoine Owens, who was Paul Quinn College's CFO at the time. In 2011, Ms. Musser was then hired on as a direct employee of Paul Quinn College. While working there as the controller, she began to uncover some things that she believed were fraudulent and that these things were being committed by her boss, Mr. Antoine Owens. Ms. Musser then brought this lawsuit for retaliation under the False Claims Act. Appellant now is appealing the district court's decision of summary judgment in favor of the defendants when it found that, one, the defendants did offer a legitimate, non-discriminatory reason for the termination, and, two, that Ms. Musser's evidence of pretext was not sufficient. That is, those are the two issues on appeal today, Your Honors, and the answer to whether or not the district court erred in its decision is yes. As our brief illustrates, and as I'm here to argue today, the reason that the answer is yes is for the following reasons. The legitimate, the reason articulated by the defendant is really not a legitimate reason. There was a clear retaliatory motive for the termination of Ms. Musser. When you say it wasn't a legitimate reason, it would be legitimate to say we restructured. Yes, that is a legitimate reason, however, Ms. Musser at the time that the decision was made to restructure, she was already on paid administrative leave, and had been on paid administrative leave, so she was engaged in protected activity, so that's why it's not a legitimate reason. Are you challenging only the ultimate termination in August of 2014? Yes, Your Honor, and the reason why... Not the leave or any of that? No, what we're saying, basically, is that when they said initially that they were going to terminate her for performance reasons back in 2011, they were aware at that time of her complaint, however, that decision was overturned, and I believe in the record, Mr. Sorrells, who was the president of Paul Quinn College at the time, he stated that the board overturned that, and the site on that in the record is, if you'll give me one second. That's okay. Okay. The board rescinded the determination, and then the board concluded its investigation, right? Yes, Your Honor. And then they kept her, and they continued to search for a new CFO at the same time. That is correct, and so when the board concluded their investigation, Ms. Musser was kept on paid administrative leave because Antoine Owens then decided that he was going to sue Ms. Musser for her complaint, so then there was a lawsuit that ensued as well. Right. I know that there was a judgment entered for PQC after Owens and Musser settled. Was that just a . . . that wasn't any relief on the merits for PQC, was it? Your Honor, I actually don't know much about the underlying case. Okay, that's okay. Who made the decision on August the 19th, 2014, to proceed with the termination? That's an interesting question, Your Honor. So President Soros testified that at first he says he made the decision. Then he goes through in his deposition and says, well, nobody made the decision. But then he also goes back and says, I spoke with John Richards about the elimination. And if you look in . . . Was John Richards on the board? No, John Richards was PQC's outside counsel, and he was the one that represented Mr. Owens in the lawsuit. And there's e-mails where Mr. Soros said that he would waive any . . . he told Antoine Owens, I will happily waive any conflict. So John Richards can help you see. Soros made the decision. It was not . . . the board did not ratify or anything the decision. It was Soros in the position of president, right? Yes, but he also goes through and tries to say, well, I did . . . who had become the new chairman of the board. But then he goes on to say, well, I think I mentioned it. I don't know. He might have said that I could do this. And, again, I can give you those sites and the record. If there is one reason that's good that you could say that you can terminate somebody because they're on leave . . . I mean, not because they're . . . because you're restructuring. And, one reason that's about poor performance that might be colored by the fact that there's been ongoing litigation and accusations of fraud. What result? Well, the result, I think, in that instance is that when there's all of these accusations going around . . . the crux of our argument is that there is sufficient evidence to establish pretext . . . disputes about the facts, as to whether or not this was pretextual. Because, again, the decision on the poor performance, it was overturned, according to the president in his deposition testimony. Ms. Musser is out because of her complaint. And so, with pretext, you have to have a but-for causation. So, we have the but-for her complaint. She would have never been placed on leave. Well, we don't know that the board actually said she didn't do poor performance. We just know the board said, you better not fire her right now. This is too risky for the school. I mean, that seems like a smart board decision, if there's an ongoing dispute brewing, just to separate everybody and call a timeout. Well, and I think some of the other key evidence to support that there was more to this . . . So, in the record on page 986, this is the email between President Sorrells and Antoine Owens. Not only is he stating, I'll happily waive any conflict, there is conversation between those two about how to go ahead and terminate Ms. Musser. This was in January of 2012. Right. Assuming there indeed is evidence in the record that Sorrells had a relationship with Owens in their friendship . . . Do you think there is a legitimate reason to terminate, based upon the restructuring? I believe that it does, because again, there are . . . In the record, there are so many inconsistent statements, because President Sorrells also goes on to say . . . The question was asked, would the new CFO, or I think they changed the title to Director of Finance . . . Would that person be able to bring back Rebecca Musser? And, he said, yes, that would ultimately be their decision. And, he also said that the new CFO slash Director of Finance, they were going to be the ones to determine their staffing needs. But then, one of the key things here is that they never got a new CFO. I mean, I think it took three years for them to get one. So, Sorrells made this decision on his own. And then, the other piece to this is that in this Court's recent decision in Garcia versus Professional Contract Services, Incorporated . . . The Court said that with . . . you have temporal proximity, plus something else. So, our temporal proximity is that as soon as that litigation ended with Antoine Owens, it was less than 30 days. I thought . . . I was on the panel, although Judge Elrod wrote the very good opinion in Garcia. How is that temporal proximity? I thought it was . . . I would have thought it's temporal proximity to the, you know, the FCA action that your client took. And then, we look forward to when the termination occurred. Isn't that what we're looking for in terms of temporal proximity? Which would be, by my count, you know, 2011 to 2014. Why should I consider what you just said, the temporal proximity? Because, to answer your question, Your Honor, I believe that even though there might have been some discussion about her poor performance . . . Again, the Board said, hey, we are going to not do this. They basically overturned the decision, which is what Sorrells testified to. So, she was never actually terminated until almost two years later. And again, the termination occurred after the lawsuit against her for . . . So, retaliation for the lawsuit, not as for the whole lawsuit situation. Well, the . . . Not retaliation for the original report, or it's all one big scheme? It's our belief that the defendants cannot rely on this whole poor performance issue. Because, when you look at the language of her termination letter, all it says is . . . We are terminating you, because we've decided to eliminate the position and your paid administrative leave is over. That is when the termination occurred. And, anything after the . . . when the Board overruled the termination on the poor performance, that was it. And, another key piece to this is Antoine Owens testifies that there was some sort of confrontation between him and Rebecca Musser on November the 10th. November the 11th is when all these issues arose about her poor performance and he recommended termination. She was not terminated. When does the evidence show that the first time that your client alleged fraud by Owens such that, you know, she triggers the FCA in that sense? When is the evidence . . . when did that happen, the first time? According to our client, and then again with Anthony Owens' testimony, November the 10th is the date of . . . November 10th, 2011 is the date that our client relies on to say that she first made her complaint to Antoine Owens. What action is she referring to on November the 10th? What is she doing on November the 10th? She's asking him about the backing out of the financial funds, and he admits in his testimony, well, yeah, if that were to happen, that was criminal activity. And so, after she confronts him about that, and he admits there was some sort of confrontation, although he does not go into the details about it. Backing out of funds, she's still talking about it? After they've all settled and it's over and it's been . . . or is it a different incident about backing out of funds? No, the backing out of funds is what triggered her complaint about the retaliation. Right, but she's talking about it in 2014? No, are you talking about . . . she's talking about it in 2011? Yes, Your Honor, so it was 2011, but the lawsuit that was filed against her based on this claim started in 2012 and did not conclude until 2014. 2014, February to then . . . Well, and just for clarification, I believe the final judgment came in in April, but then Mr. Owens filed a motion for new trial, which I don't believe was scheduled to be heard until about August 29th of 2014. And that's where I go back to temporal proximity. I'm hearing about a confrontation on November 10th, 2011. The firing is in 2014. I understand there's this intervening lawsuit, but is the inference that you say is a reasonable factual inference is that they waited all of that time to then finally fire her based on an FCA retaliation theory? Yes, Your Honor, and again, when she was left out on leave, because we don't know exactly when the investigation ended. I believe Mr. Sorrell testified maybe sometime late January of 2012, early February. February 13th is when Mr. Owens filed his lawsuit, so the testimony and the evidence in the record says the Board decided to just keep her on leave and not to do anything. When did she come off leave? August . . . she never went back to work. She never came off of leave. She was on paid administrative leave all that time from . . . Yes, Your Honor. Yes, so when you look at that, that they kept her on leave but for the complaint, which is what initially put her on leave, then she stayed on leave but for this lawsuit, because the other issue with that lawsuit is that Mr. Owens eventually brought in PQC as a defendant in that lawsuit, and PQC had to pay Ms. Musser's attorney's fees, and then, of course, they had their own attorney's fees. So right there is what is the clear retaliatory motive, because now the college has been brought into another lawsuit. Who paid her the $20,000? May you repeat the question, please? Who paid her the $20,000? I believe that might have been the settlement between her and Mr. Owens, according to the testimony . . . no, not the school. The school paid her attorney's fees. Yes, through their D&O policy. So once we look at the shifting reasons that they have offered, one of the things, again, is that when you look at the language of the termination letter, all it states is that they terminated her based on the fact that they had decided to restructure the position. But again, none of these talks came about until she was out on leave. President Soros can't even tell you if it was a monetary . . . You may finish your sentence. If it was a monetary benefit to them. So we ask the court to reverse and remand this decision back down to the district court for further proceedings. Thank you, Counsel. Thank you. May it please the court. My name is Alicia Voltmer. I represent the Applee-Paul Quinn College, or PQC, a historically black college. With respect to the plaintiff's arguments, I would like to note that Counsel stated that she was appealing or that the plaintiff was appealing on the no discriminatory . . . or excuse me, discriminatory reason and on pretext, but their brief only addresses pretext. I'd also like to start with the legitimate non discriminatory reason and then pretext. So, the prima facie case was not something that was addressed in their brief to this court. It was only the pretext argument. To Your Honor's point about the . . . They have a prima facie case. I'm sorry? They have a prima facie case, don't they? No, Your Honor, they do not. They do not. And here's why. The decision to terminate the plaintiff was made prior to her complaint. Whether you date that complaint as November 10th, when she sends a one sentence email that says, we need to back out of invoices . . . or you consider it as November 18th, when she submits her memo saying, I believe there's fraud. So, you're saying she was . . . you're sticking with the decision to terminate was based upon her poor performance? I'm saying that the performance and the reorganization were parallel in course. And there is proof of that in the record. So, you're going to rely on the performance issue? We're relying on both, because they were proceeding on a parallel track. Now, the letter said just the restructuring. But then, in the deposition, I think it was Sorrell said, well, it was both. That's correct. How is it they're on a parallel track? I don't understand that. Because in early November, the record is clear and it is uncontroverted that . . . 2011. I'm sorry? 2011, we're talking . . . Yes, 2011. President Sorrell and Mr. Owens, the CFO, attend a TRACS conference where Mr. Owens says, we need to get rid of Ms. Musser. She's not doing her job. Then, on November 11th, Mr. Owens sends President Sorrell a memo where he says, we are trying to find a new CFO. I would like to let her go at the end of the year, but her performance is so bad that we're going to have to consider doing it earlier. That is in the record and that is at 742. So, there is this reorganization long before she makes a complaint. And, in fact, Mr. Owens resigned in early 2011 and stayed on as an acting CFO. Ms. Musser participated in interviews with new CFOs. She knew this reorg was coming. President Sorrell testified, uncontradicted, my goal was to let the new person come in and make a decision as to what he or she would do. Whether they wanted a comptroller or they didn't want a comptroller, it would be up to them. November 11th, when Owens suggests to Sorrell, I've been saying it wrong, when Owens suggests to Sorrell that Musser should be fired, Owens knows that Musser's been trying to talk to the president, Sorrell, about Owens's alleged fraudulent conduct. He's been trying to get in a meeting with him that whole time. Mr. Owens does not know that. He was asked in his deposition, or she was asked if she told him in her deposition, and she said no. He did not know. So, he had no clue that she's been trying to get in to see the president about an urgent matter. That is correct. Even though they're best friends, Owens and Sorrell, and that Sorrell's dodging her meeting requests. Let's make something clear. There is no evidence in the record that Mr. President Sorrell and Mr. Owens are best friends that he's thieves. I thought there is some evidence that they allege that. They allege that, but I have not seen any evidence in the record that the two said that they were best friends or that they spent a lot of time outside of work together. No. The time that she was out on leave, was anyone doing her work? Was anyone filling that position, or was that part of the restructuring that if she was gone for two years and nobody did that work, well, maybe no one needs to have that position. So, Your Honor, that was contemplated by Mr. Owens before Ms. Musser ever complained, and the short answer is that the college had been utilizing an accounting firm called E. Cratchit, and E. Cratchit had been doing most of Musser's work that was part of her performance issues that are well documented in the record. So, when she went out on her leave, some of the job responsibilities were maintained by E. Cratchit, and as the record states, some were simply absorbed internally. So, it was not all outsourced to E. Cratchit as plaintiff contends. That is not the case. That is not what the record supports. But no one was hired specifically to take her position. She has never been replaced. She virtually eliminated her position. That is correct. She's never been replaced. Why do you say it's on a parallel track with performance? The new CFO was hired in August of 2014. He did not elect to hire a controller. They did not hire a controller. Who made the decision on August 19th to send her the letter, to have Price send the letter notifying her that she'd be fired? Is your question who instructed the letter to be sent or who made the termination decision, Your Honor? The termination decision was made by President Sorrell. He testified he did not need board authority to do that. So, he did instruct Ms. Price, who was at that time his cabinet leader, to send the letter. I would also note there that plaintiff's counsel has said and in their briefing has also stated that that termination decision was revoked by the board. I would ask the court to take a very careful look at that testimony that's cited because at the record 994, right after what the plaintiff cites, Mr. President Sorrell says, well, we haven't actually made a decision on it. Wait a minute. Your termination revoked by the board, you're not talking about August 19th, 2014. No. Plaintiff… I'm talking about August 19th, 2014. Right. You said Sorrell made that decision. Sorrell made the decision. He instructed Price to send the letter and he made that on his own. That is correct. And is there evidence in the record that it was in consultation with Owens? No. No. Mr. Owens was also on a leave of absence. He was not working at the college either. Neither of them was. So with respect to the pretext argument, they've made four points that I would like to briefly address. Number one, when the plaintiff has argued that because she was on leave, it was because of this, it was because of her protected activity and her position was replaced, that holds no weight. As the court knows, if there is a reorganization, even if you've engaged in protected activity, if you have a legitimate reason, you have a reason unless there is some other evidence of pretext, which there is not here. Number two, one of the arguments… Some other evidence of pretext. Well, that is what this court said in Garcia, was you need close temporal proximity and significant evidence of pretext. They have put forth four arguments for significant evidence of pretext, and Paul Quinn does not believe they meet that standard by any of them, any of those arguments. Sure. So their second argument in their brief is… What was the first one? The first one was that the position was eliminated because the duties were assigned to others while she was on leave because of protected activity. That is the title of their first argument. The duties were assigned to others while she was on leave. In part and in part absorbed. That is correct. So you're saying that's their argument for why the ultimate decision to fire because of reorganization was pretextual. That is Plaintiff's argument in their briefing. Maybe I'll ask him about that in rebuttal. I don't understand how that's a pretext argument to begin with, but… Well, Paul Quinn agrees with you, Your Honor. Their argument number two is that President Sorrell's explanation of a reorganization is unworthy of credence. I would submit to the court that it is not within the Fifth Circuit's purview to make a credibility call. But if the court decided that it wanted… I think there's a credibility issue. You're right. It's not within our purview. We have to send it to the jury. So that's not a good thing if you think there's a credibility issue. Well, I guess what – let me just try to understand that. Are you saying that their argument is Sorrell's not credible? Yes. Are you saying – I don't want to put words in your mouth. Are you saying, well, there's no evidence contravening his credibility? Where's the evidence undermining his credibility? That is correct. We're not arguing that there's no credibility. That's the plaintiff's argument. And what we're saying is that it's an argument that shouldn't even be considered by the court here. Well, then, on rebuttal, we'll ask them, you know, where's the evidence that would create a jury issue? So, three. Number three. President Sorrell had a retaliatory motive. Again, there is no evidence that he and Mr. Owens were thick as thieves and somehow conspiring to get rid of Ms. Musser. Well, the fact that she's in a lawsuit with the college is itself evidence that he would have a motive. Your Honor, she didn't sue the college. Mr. Owens sued Ms. Musser. Ms. Musser countersued Mr. Owens. My client paid for that countersuit, by the way. And then Mr. Owens sued the college. Defamation? Yes. Sued her for defamation. She counterclaimed. She counterclaimed. But PQC was never added as a defendant in that lawsuit. By Mr. Owens, not by Ms. Musser. So, in other words— He sued PQC. Yes, yes. The person who's supposed to be thick as thieves with my client went ahead and sued them as well. Even though his lawyer was the lawyer for PQC. Well, and he withdrew very quickly, by the way. Yes. That is correct, Your Honor. You are correct. Why did he sue PQC? Owens. Your Honor, I honestly do not remember. But he did. He did. And they did—I think, Your Honor, one of the questions you asked was, was there a judgment on the merits? And I believe the answer is yes. But the judgment, I think, is in the record. I'm not sure of PQC. Owens and Musser, they have a settlement, just a release kind of judgment. But PQC actually has a judgment on the merits, doesn't it? Yes, it does. Okay. It does. For Mr. Owens' claims, because he was the only person who claimed against the college. Three was the retaliatory motive of who? Sorrell? President Sorrell had a retaliatory motive. Okay. The question is whether there's a fact issue with respect to that. Right. So I would also note there is no evidence that the same attorney who was representing Mr. Owens for a very brief period of time was the same attorney who made the decision or who consulted with President Sorrell. That's not in the record. The testimony is I consulted with an attorney, even if it were the same attorney. Where is the evidence that they were also conspiring and somehow that attorney influenced President Sorrell? Well, that seems rather odd that you would give legal advice in that situation. I can't say if he did or didn't. The evidence in the record is that an attorney gave advice to President Sorrell. That's all it says. I would also note as a reminder that my client paid her bills not only for the lawsuit where Mr. Owens sues her, but for her counterclaims back. Paid all of that through the D&O insurance. That is correct. They also hired an outside law firm to do an extensive investigation into the allegations, and they kept her on paid leave. She lost no benefits and no pay whatsoever. So I— Is there a four or did I miss four? No, no. There is a brief four. Four is shifting reasons. And I wrote down one of the arguments that counsel made was they can't rely on performance. Well, if that is what the court believes, then you can't come back and use that as a sword against me and say, well, now you've got shifting reasons. If you're telling me that I can't use performance because the termination decision was revoked, which it wasn't, but assume it was, then you're going to come to me again and say, well, now you've got a shifting reason because you're saying a reorg. You can't have it both ways. We have always contended that the performance and the reorganization proceeded on parallel lines. That's what the evidence shows, and that's what we have argued consistently. She had performance issues long before she ever made a complaint. Those are documented in the record. Before she, when I asked counsel opposite what was the first date that the record reflects that her client, you know, did something that would trigger the FCA, you know, brought to the attention of the college some fraudulent activity, allegedly. She said November the 10th, 2011. That is the plaintiff's argument. I would submit that a one-line e-mail that says, do we need to back out of Sun Guard invoices, which is almost verbatim what that e-mail says, has no indication of fraud whatsoever. And under controlling case law in this circuit, there's got to be some evidence or some manifestation of fraud. Now, plaintiff's counsel said, well, Mr. Owens testified that he understood if it were done incorrectly, it might be fraud. What's also in the record is that Mr. Owens, or excuse me, Ms. Musser testified she never used the words fraud with him ever until the November 18th memo. And she also testified she had no idea what was in his mind when he received the e-mail. It could have been a wrong entry. It could have been a mathematical error on an invoice. Simply saying, hey, do we need to back out of an invoice, that doesn't tell me anything about fraud. Are you also saying, I think what I was following up on was you said there's evidence of poor performance in the record. Is there evidence prior to the November 10th date that? Extensive, yes, starting back in around August, September. Is this the evidence of sort of going directly to, you know, going around the Owens or something like that, going directly to parents and responding to complaints? Is that that kind of evidence? It's that kind of, excuse me, that kind of evidence plus President Sorrell's own observations saying she wasn't following instructions. She wasn't getting things done. There were assignments that weren't completed, those kinds of things. But those were months, months before either November 10th, if that's the date, or the 18th. Wouldn't it have been much easier for the case if President Sorrell had just kept to the reason given in the letter and not talked about her poor performance at that point? Your Honor, I don't know if it would have been easier. I think that there probably was a disconnect between the person who made the decision and the person writing the letter. But the performance never went away, and that termination was never revoked. The plaintiff was never told, hey, we're revoking that performance thing, you're good. It never happened. She testified. She wasn't told it was revoked. President Sorrell said, I never told her it was revoked. That the board decided to keep her on leave and to retain that leave, that is a fact I can't change, but that's what happened. During the whole pendency of two-plus years of lawsuits between Mr. Owens and Ms. Musser. I mean, I guess the question for us is whether that evidence creates a fact issue with respect to pretext. Isn't that the ultimate question? Well, I think it is, Your Honor, but there's a difference between a fact dispute and a fact disagreement. So where is the controverting evidence to say that Mr. Owens was lying or President Sorrell was lying? There isn't any of that. This is, we don't like what the facts say, so we're going to disagree with them. Point to the record and show where there is an actual factual discrepancy, that would be different. But we don't have that here. Do you have anything further, counsel? Your Honor, I would like to mention that I do believe that the district court could have easily dispensed with this case on the statute of limitations argument. It's a three-year statute. Is that in your brief? Yes, it is. Yes, it is. In fact, it was our opening argument below, and it is also in our briefing here. It's a three-year statute. She complains whatever date you take, November 10th or the 18th. Lawsuits filed almost six years later. The decision, actually, the ultimate termination decision is not until October, August 18th. Right, but that's not the law in this circuit. It is when there is notice of the action, not the date when the action is effected. That's Supreme Court law that we've cited in our brief. You contend that it started running back in 2011? We do. Okay. Thank you. Your Honors, if I may, I'd like to point out a few of the things that counsel said. So the first thing that she talked about was that Sorrells, when he made the decision to eliminate, that he said that, you know, he just spoke with an attorney. He actually names on page 488 in the record, he spoke with John about elimination of the position, and then he also states that he spoke with, he thinks he might have spoken with Bishop McKenzie, who was the new chairman of the board, but he doesn't recall if he said. But most of everything that he talked about determining the elimination, he spoke with John, which John is the same lawyer who believed it was a great idea to represent a former employee in suing a current employee. The other thing I would like to point out is that, yes, there was a law firm that did help with the investigation of the claims, but the law firm was owned by one of the board members, so she talks about they spent extensive money. Who knows? Because Antoine Owens said that when John Richards hired him, when he hired John Richards to sue Rebecca Musser, he was not charged by PQC's outside counsel. So, again, who knows what amount of money they spent. I'd also like to point out, when we talk about the retaliation issue, if you will allow, I would like to read something to you. After Mr. Sorrells received the email from Antoine where Antoine states, also I would suggest that you finalize her termination through the Bowles Group, who in the record it's indicated the Bowles Group is PQC's, I guess, HR function. And he was like, and I would also have John demand that she return the pay she received while on suspension. That is when Mr. Sorrells, and, again, this is page 986, says, I'm happy to waive any conflict of interest for John. And he says, I don't foresee us getting any money back, and I'm not sure what the board is thinking in the issue of dealing with Rebecca. My goal is to point out that she was fired from the college as of December 31st anyway, and I'm letting that stand. And then he goes on to say, I think people will want to give her some sort of package, but I'm going to say that the six weeks that she was paid and did nothing is package enough, and she shouldn't even get that. So there was a retaliatory motive, whether it be money. Retaliation for what, though? I mean, that sounds angry. It sounds, yes, it sounds upset. But what is it? Is it evidence that a reasonable fact finder can make that it's retaliation for what? To prove that there was a retaliatory motive for pretext, which helps. Retaliatory motive, though, for what? To ultimately terminate her because of her complaint. Okay. All right, the complaint. And, again, he did not know what the board's plans were with Ms. Musser, so he wanted to get rid of her and the board stopped that decision. When he ultimately decided to get rid of her in 2014, after making statements that, oh, I did not make this decision, or, yes, I talked with John, we just decided to eliminate this, he gave very different reasons for why he ultimately made the decision and tried to hide behind, I didn't make this decision, but then goes back and says that he did. So he wanted her gone. That was evident. Antwon wanted her gone. Even after Antwon was no longer employed there, he's sending emails saying, you need to go ahead and finish her termination. They wanted her gone by any means necessary. Was there communicating about it during the August time period, or when is that email? No, this email was dated January 16th of 2012, so a month before Mr. Owens filed his lawsuit. So it's not during the time period that the decision was actually made. No. But he's encouraging him to move forward with any sort of termination. And I'd also like to point out that one of the things that was discussed, too, was about the, we don't know if anyone here is a liar, I believe is what counsel alludes to. We don't know if they were telling any lies. I mean, Anthony Owens has admitted that he did some fraudulent things. He admitted to lying to auditors and recreating financial forms. And also one of the things he admitted was that he was upset with Musser because she had made some comments. So, again, this all seems that he did things because he was upset with her. He even goes on to admit that even though there were these performance issues, allegedly, that he never wrote her up for the very first time until November 11th of 2011 for any sort of performance issues. And, ironically, that is the day after he says that there was some sort of confrontation between the two. So, again, for the, we don't believe that there was any sort of legitimate reason. Thank you.